[No. 1543.]

## HIRAM MILLER *v.* THE STATE.

1. MURDER.—If it appears that a defendant, acting together with A, B and C, or either of them, provoked a conflict with the deceased with the purpose and intent of killing the deceased, or doing him serious injury, and, in pursuance of this common design and purpose, A, B and C, or either of them, the defendant being present, shot and killed the deceased, then the defendant would be guilty as a principal in the murder, as much as if he had fired the fatal shot.

2. SAME.—If, in the conflict with the deceased, A, B and C were justifiable in killing the deceased, the defendant would not be guilty of the homicide. Thus, if A in good faith, without the purpose or intent to kill the deceased or do him serious injury, advanced upon the deceased for the purpose of arresting him for a felony or breach of the peace committed within his view, and the deceased fired upon him, and A, or B, or C, or all of them together, fired upon and killed deceased in the necessary defense of the life of A, then the killing would be justifiable, and neither A, B or C, nor the defendant, would be guilty of unlawful killing.

3. SAME.—If an anterior difficulty between the defendant and the deceased had terminated, and A, B and C, without the knowledge, advice, concurrence, aid or encouragement of the defendant, independently, of their own accord, and to accomplish a purpose and intent of their own, shot and killed the deceased, the defendant would not be responsible for their acts, although he was seeking himself to kill the deceased unlawfully.

4. SAME—ASSAULT WITH INTENT TO MURDER.—If the defendant attempted to shoot the deceased with intent to kill him, and in such attempt was actuated by malice aforethought, and under circumstances which, if the death of the deceased had resulted, the homicide would have been murder, and the defendant was prevented by any cause from effecting his purpose, then he would be guilty of assault with intent to murder.

5. SAME—EVIDENCE—MANSLAUGHTER—CHARGE OF THE COURT.—See this case for evidence held not to warrant a charge upon, nor to sustain a conviction for manslaughter.

APPEAL from the District Court of Leon. Tried below before the Hon. J. R. Kennard.

The indictment charged the appellant with the murder of Robert Linson, in Leon county, Texas, on the twenty-fifth day of March, 1882. The conviction was for manslaughter, and the penalty imposed by the verdict was a term of two years in the penitentiary.

H. F. Tetor was the first witness for the State. He testified
that he was in the town of Jewett, Leon county, Texas, on Sat-
urday, March 25, 1883, the day on which the deceased was killed.
The witness walked into town, arriving at about one o'clock,
when he went to Cockrell's saloon, and sat down just inside the
door. While there the witness saw Swan Hardin, and a man
whom he did not know, at the desk behind the counter, engaged
in a suppressed conversation. They appeared to be moving their
arms to and fro, but the witness could not see that they had any-
thing in their hands. The stranger referred to went out of the
saloon and up the street, or north, and Swan Hardin went out
of the saloon at the same time, working or pulling at his vest.
The witness could not say that he was buttoning his vest, but
he appeared to be pulling at it in front, or about the breast.
Within a very short time, witness could not say how many min-
utes, after Swan Hardin and the stranger left Cockrell's saloon,
witness heard a row up the street in the direction taken by the
stranger when he left the saloon, and went up to the place and
saw a man, who he was told was Miller, pounding the deceased,
having the deceased down. The witness did not then see Swan
Hardin anywhere about that place. He could not say that the
defendant on trial was the man he saw at Cockrell's saloon with
Swan Hardin, nor could he say that the man he saw at the sa-
loon with Hardin and the man he saw pounding the deceased
were one and the same. The witness declined to swear posi-
tively that the defendant was the man whom he saw with Swan
Hardin in Cockrell's saloon.

John A. Sheffield testified, for the State, that when the diffi-
culty occurred he was in his store in Jewett, which stood
between Levy's store and Evans's drug store. About or a little
after the time the first shot was fired, the witness saw A. B.
Hardin, jr., pass the witness's store door, going in a swift walk
down the pavement, in a southerly direction. As he passed the
door he drew a bright and shining something from his pocket.
Witness could not say what it was—whether a pistol, knife or
some other article.

Jeff. Adkisson testified that he was in the store house of Ad-
kisson & Ward, next to and south of Evans's drug store, at the
time of the difficulty. He did not see the beginning of it. The
parties were scuffling when the witness first saw the row; Miller
had Linson down, and was striking him and spurring him in
the face. About that time, and while the row was going on, the

witness saw A. B. Hardin, jr., on a gallery near by, with a pistol in his hand.   A. B. Hardin, jr., had the pistol partly raised when a man whom the witness did not know called out to him: "Give it to me, Dick; give it to me."   The witness then saw A. B. Hardin's hand go towards the man, and saw their hands meet, but, the crowd gathering about so as to obstruct the witness's view, he could not say positively that the man actually got the pistol from A. B. Hardin, jr.   Just after this the witness saw Linson, the deceased, and a man said to be named Harris, shooting at each other.   The witness did not know the man Harris, and could not say positively that he was the man to whom he saw A. B. Hardin, jr., reach the pistol.   Shortly after the shooting between Linson and Harris, a wounded man, said to be Harris, came into the store where the witness was, and asked if he could get a gun or pistol.   Being answered in the negative, he said that if he had one he " would go for him again." The witness could not say that this was the same man to whom he saw Hardin reach the pistol, but he was pointed out to the witness as Harris.

C. M. Black testified, for the State, that Linson and Miller were scuffling when he first saw them.   He saw Dick Hardin and Elly Harris on the gallery near Evans's and Adkisson & Ward's stores, about that time, and heard Harris say: "Give it to me, Dick; give it to me."   He then saw Hardin hand Harris something that looked like a pistol, though he could not swear positively that it was a pistol.   The firing took place immediately afterward between Harris and Linson.   Linson jumped off Evans's gallery, and immediately the shooting between him and Harris occurred.   The shots were very close together, and the witness could not say who fired first.   Both parties fired twice.   Just after Harris quit firing he went into Adkisson & Ward's store.   The witness, when he saw Miller beating Linson, whom he had down, started with others to separate them.   As he started to make the attempt, Swan Hardin, who was standing by, shook his head and said: "Don't you do it."   Knowing the man as well as he did, and influenced by his manner of shaking his head, the witness abandoned his purpose of separating the combatants.   About this time other parties rushed in and took Miller off of Linson, and Swan Hardin did not interfere.   When Linson got up, he backed up against the wall, drew a pistol, and fired at Miller.   He then sprung off the gallery, and it was then that the firing took

place between him and Harris. Linson then got behind a hack, and after a time called for his horse, which was taken to him by Mr. Oden. He was doing something while behind the hack, but the witness could not tell what. When his horse was brought to him he leaped into the saddle, and fired at Swan Hardin. Swan Hardin fired at him at about the same instant, and started toward him. Old man Hardin at this moment, having a gun in his hand, exclaimed: "Somebody arrest him with this gun." Thereupon Dick Hardin started toward Linson. Swan Hardin and Linson exchanged some words, which the witness did not hear, just before the firing commenced between them. The witness did not positively know whether or not Dick Hardin fired a shot. Old man A. B. Hardin fired at Linson twice, as the latter rode off, and after he, Linson, had quit shooting. A. B. Hardin, sr., had a gun. A. B. (Dick) Hardin, jr., had a pistol in hand when the shooting between Linson and Swan Hardin began. Linson had not put up his pistol since the shooting between himself and Harris. Linson fired, as he mounted his horse, before Swan Hardin did, if there was any difference at all in point of time. The whole occurrence occupied but a few minutes. Before the firing between Linson and Harris occurred, the witness went to Cockrell's saloon and saw the defendant Miller in that saloon, with a Winchester rifle. He leaned the gun up against the door facing when the witness and others interposed. He then laid it on the counter. This was just before the firing. The defendant did not have a gun when the row occurred between him and the deceased, but went off and got one after Linson shot at him, and returned with it to Cockrell's saloon. When Swan Hardin went toward Linson, he went from toward Hardin's store. He walked leisurely and slowly, and without any outward sign of excitement. He had no pistol in sight. He and Linson, while talking just before the shooting, talked in an ordinary tone of voice.

Captain Frank Fant testified, for the State, that just about the time the row between the deceased and the defendant began, he saw the defendant approach the deceased, and heard him say to the deceased: "You have said something about me you have got to take back, or there will be trouble." He referred to something Linson had said at the stock pens—the witness did not know what. Linson replied: "I have nothing to take back." Linson was a very small and the defendant a very large man, their comparative sizes being as a bull dog to a fice. When the

defendant approached the deceased the latter was walking along quietly, and was saying nothing to anyone. When the deceased said that he had nothing to take back, the defendant grabbed him. Mr. Oden, the deceased's step-father-in-law, took hold of the defendant, and John Nugent caught the deceased, and the two tried to separate the belligerants. At this time J. E. Harris hooked his arm around Oden's neck and pulled him loose from the defendant, and defendant struck the deceased in the face with his fist; then kicked him in the face with his boot, and then turned his foot and spurred the deceased in the face with a spur he wore on his heel. About this time some one called out to part them, and the witness started to do so, when Swan Hardin called out: "I will shoot the first d—d man that touches them." Witness made no further attempt to interfere. Wiley Wiggins and John May then rushed in and took Miller off the deceased. The deceased, on getting up, backed up against the wall between Evans's drug store and Adkisson's store, and reached behind him for a pistol. John Nugent was standing on one side of the deceased at that time, and Mr. Oden on the other. The defendant went around in front of the deceased, and advanced upon him, cursing him. When the deceased put his hand behind him, Miller exclaimed: "You have got a pistol, and if you draw it, G—d d—n you, I will kill you." Deceased got his pistol out, fired, called out, "clear the way," jumped off the gallery, and the firing between himself and Harris began, Linson firing first, if there was any distinguishable difference at all. After this firing, Harris went into Adkisson & Ward's store, and Linson went behind a hack. About this time the witness saw Miller coming from a north direction, from toward Hardin's saloon, with a Winchester rifle in his hand. When he got to Evans's gallery, he threw the gun to his shoulder and aimed it toward the hack where the deceased was. He could see the deceased's lower limbs. Linson passed around the hack and aimed his pistol toward Miller. Thereupon Miller jumped into Evans's store, got behind the door, and again brought his gun to bear on the hack. Linson went back behind the hack. When Miller threw up his gun in the drug store, Doctor Evans shoved him out, and he went south in the direction of Cockrell's saloon. Linson did not go to the front of the hack, nor present his pistol, until after the defendant had aimed his gun at the hack. When Linson last went behind the hack, Mr. Oden led his horse up to the back of the hack. About that time the county attorney exclaimed:

"We must arrest that man, or those men, who have been shooting." · Witness then saw Swan and Dick Hardin going toward Linson. Swan walked up very near to Linson, and Dick was just in his rear. Old man Hardin was then standing on his gallery. Linson made no assault, or attempt to shoot any one, while his horse was being brought to him. As the Hardins approached and his horse was brought up, Linson threw himself into the saddle and fired at Swan Hardin. Swan Hardin then shot him, the shots being fired very near together. Linson's horse sprang off, and Swan Hardin shot twice at the deceased. Witness saw A. B. Hardin shoot once. He did not see Dick Hardin shoot at all.

So far as this witness knew, the remark of Monroe, that the parties shooting should be arrested, was addressed to no one in particular, but to the crowd in general. The two Hardins, Swan and A. B. jr., were the only parties witness saw attempt the arrest of Linson. The witness heard no conversation between the Hardins and Linson before the firing began. Swan Hardin was struck by one of Linson's balls, and died two days afterward. Linson was shot entirely through, and fell from his horse, after going about fifty yards, and expired immediately.

V. A. Monroe testified, for the State, that he was in the saloon with Cockrell when the shooting took place. After the shooting between the deceased and Harris occurred, the defendant came into the saloon with a Winchester rifle. When he got into the saloon, he turned and aimed the rifle in the direction of Linson. The witness caught him and said: "Hiram, don't do that." Then witness, C. M. Black and John Nugent took hold of him and told him to put up his gun. Bob Monroe came up about this time and told him to put his gun down. Miller put his gun on the counter and said: "Arrest that man." About that time · the shooting took place between the deceased and the Hardins. About the time that the deceased fell from his horse, the defendant, with his gun in his hand, jumped out to the gallery, and exclaimed: "Why in the h—ll didn't you let me do that?"

Dr. W. F. Evans testified, for the State, that just after the shooting between the deceased and Harris the defendant came to the gallery, in front of witness's store, with a Winchester rifle, and pointed in the direction of the hack behind which Linson was then standing. Linson stepped from behind the hack and presented his pistol, when the defendant sprang into the witness's store and again raised his gun, when the witness, fearing that

Linson would fire into the store, shoved the defendant out, and he went off in a southerly direction. Linson did not advance from the hack nor present his pistol until the defendant raised his gun, nor did the defendant lower his gun until the deceased advanced from the back of the hack, pistol in hand. The defendant did not shoot from the gallery or store. He could plainly see the lower limbs of the deceased.

C. E. Ward testified, for the State, that he was going from his residence to his store, and was some two hundred and fifty yards distant when the first shot of the fight was fired. He increased his speed after the second firing, and when he had approached within about seventy-five yards of the hack, which stood some twelve or fifteen steps from the gallery of the stores, he saw the deceased standing behind the hack, and Swan and A. B. Hardin, jr., advancing upon him. A. B. Hardin, jr., was a little in the rear and to the left of Swan Hardin. About the time the Hardins advanced, Mr. Oden led Linson's horse to him, and Linson, leaping on his back, pistol in hand, fired at Swan Hardin, and was fired at by Swan Hardin so closely that the two reports sounded very much like one. Swan Hardin fired again, and then A. B. Hardin, sr., and A. B. Hardin, jr., fired at the deceased, as he ran off on his horse. A. B. Hardin, sr., stood on the gallery and fired with a shotgun. He did not shoot until after the shooting between the deceased and his sons began. Deceased fired a second shot at Swan Hardin as he (deceased) ran off. The right hands of the Hardin boys were towards the witness as they advanced upon the deceased, and the witness saw that each had something in the right hand, which the witness took to be pistols. Swan Hardin fired at once when Linson fired, and did not draw his pistol; he had it in his hand. A. B. Hardin, jr., did the same. The firing was very close together, but Linson fired first. He did not fire until the Hardins were within fifteen feet of him. His horse sprang forward and ran about fifty yards, when Linson fell and almost instantly expired.

B. D. Dashiell, county attorney of Leon county, testified for the State as follows: " I was in the town of Jewett on the day of the difficulty, and was at the house of E. E. Barnes, about three hundred yards from the scene of the difficulty, where I boarded. While sitting near the window next to town, writing, I heard one pistol shot, and very soon after that three or four other pistol shots. I then got up, laid down my pen, walked to the door and looked out, but could see no one, my unobstructed

view reaching as far down as the street running before the
stores. The place where I was was west of and behind the
stores. Hearing no more shooting after I got to the door, and
seeing no one, I walked back and resumed the seat I had left,
after standing a short time in the door. I had just resumed my
pen when I heard the last shooting. I laid down my pen and
went down town. Mr. J. J. Dotson lived diagonally across the
street from where I boarded, and if he had been on the street
going in the direction of town when I looked out of the door as
above stated, I would have seen him, unless he had gone down a
back street, or had turned to the left, as he would have had to
do to get into the back door of Platt & Reed's store, that store
being near the centre of the block in front of which the difficulty
occurred. The house I boarded at fronted on a street that ran at
right angles to the street on which the stores of the town faced,
and was on the opposite side of the street. I could see down·
that street to the point of intersection, and remember well that I
could not see a single person when I looked out. The street was
entirely clear. If Mr. Dotson had gone down the street back
and north of the one on which his house fronted, or had turned
to the left where the Masonic Hall stands, I could not have seen
him when I looked out." At this point the State closed.

Ike Livingston was the first witness for the defense. He testi-
fied that he lived in Leon county, and was in the town of Jew-
ett on May 25, 1883. He saw the defendant and the deceased in
a scuffle on the sidewalk in front of Doctor Evans's drug store.
Wiley Wiggins, Colonel Black and John May parted them.
Quite a crowd was around at the time, but the witness saw no
one else take part in that affray. Immediately after the fight,
the deceased drew a pistol and fired at the defendant, but missed
him. He then jumped off the gallery and fired at Harris, who
was coming down the street toward the crowd. Harris fired at
the deceased, and two or three shots were exchanged between
them. The deceased then went behind a hack which stood in
the street. Witness could not tell what he was doing while be-
hind the hack. The witness then saw the defendant coming
down the street with a gun. The deceased stepped from behind
the hack and presented his pistol at the defendant when the
defendant sprang into the drug store and presented his gun at
the deceased. Doctor Evans pushed the defendant out of the
drug store, and defendant went on down the street to Cockrell's
grocery. Bob Monroe approached the witness and requested

him to arrest the parties doing the shooting. Witness advised him to arrest them himself. A. B. Hardin, sr., who was standing near at the time, spoke to Monroe, saying: "Here, Bob, take this gun and arrest them." Monroe did not take the gun, but went on down the street. Swan Hardin then walked leisurely and slowly to where the deceased was, and some conversation between them ensued, which witness could not hear. The deceased sprang on a horse which had been brought to him by Mr. Oden, and fired at Swan Hardin. Swan Hardin returned the fire. The witness then saw A. B. Hardin, jr., come down the street and go to where Swan Hardin and deceased were shooting at each other. Witness did not see A. B. Hardin, jr., until after the shooting commenced between Swan Hardin and the deceased. Witness, A. B. Hardin, sr., and Swan Hardin were standing in front of Hardin's store when Monroe requested witness to arrest the parties. Witness saw no pistol in Swan Hardin's hand when he went out to where the deceased was. A. B. Hardin, jr., was shot through the arm during the difficulty.

John Nugent testified, for the defense, that he, the defendant and J. E. Harris went to Jewett on May 24, 1882, with a herd of cattle. He saw the deceased taking drinks at Swan Hardin's saloon on the evening of the twenty-fourth and morning of the twenty-fifth. He saw A. B. Hardin, jr., in Jewett on the evening of the twenty-fourth, in company with Dock Dubois and Reese Nichols. He knew that good feeling did not exist between Swan Hardin, A. B. Hardin, jr., and the defendant, Hiram Miller, inasmuch as they had previously had a difficulty. Swan Hardin, A. B. Hardin, jr., and the deceased appeared to be good friends prior to the difficulty of March 25, 1882. Witness had never heard of trouble between them up to that time. The deceased and the defendant met about one o'clock in front of Doctor Evans's drug store. Some words passed between them, when the deceased threw his hand behind him, and was clinched by the defendant. Oden, the deceased's step-father-in-law, caught the defendant, and Harris, a brother-in-law to the defendant, caught Oden. The deceased and defendant were finally parted by some bystanders. After they were parted, Oden said to the deceased: "Bob, stop this." Deceased replied: "Let me alone." He then drew his pistol and fired at the defendant, jumped off the gallery into the street, and presented his pistol at Harris and fired, after Harris called out: "Don't shoot me." Harris had no

pistol in his hand at that time that the witness saw, but the witness believed he grabbed one from some one in the crowd, with which he fired upon the deceased. According to the recollection of the witness, Harris shot twice at deceased and deceased shot four times at him. During the scuffle between Harris and Oden a pistol dropped to the gallery floor, but witness did not know which of the two men dropped it  After the shooting between the deceased and Harris, the deceased went behind a hack which stood in the street, where he reloaded his pistol. Harris went into Adkisson & Ward's store. Witness then saw the defendant coming down street with a gun. He went to the front of Evans's drug store, when the deceased stepped from behind the hack with his pistol presented at defendant. Defendant sprang into the drug store, but was pushed out by Doctor Evans. He then went to Cockrell's saloon, passing near the hack behind which the deceased was standing. About this time Bob Monroe said: "That man must be arrested," and A. B. Hardin, sr., replied: "Here, Bob, take this gun and arrest him." All the Hardins were then standing in front of the Hardin store door. Swan Hardin and Bob Monroe then went down the street together towards Cockrell's saloon. Witness soon followed and saw the defendant at Cockrell's corner with a gun. He told the defendant to put the gun down, as deceased was going to be arrested, and he said that he would. Witness did not hear the defendant say, at Cockrell's saloon: "Why in the h–ll didn't you let me do that?" If he had made such a remark witness would have heard him.

Cross-examined, the witness stated that he testified before the examining court, and he acknowledged his signature to the written evidence exhibited, which signature he said he wrote after that evidence was read to him. He did not remember that he testified in the examining court that defendant, when he approached deceased, said: "You have said something about me you have got to take back, or there will be trouble." If such a statement was in the written evidence (and it was), it was true. Witness's recollection was fresh then. If he stated on that trial (as the written testimony showed that he did) that either Oden or Harris said "We don't want foul play here," then it was true. The witness did testify before the examining trial that defendant said, when deceased went to draw his pistol: "You have got a pistol; if you draw it I will kill you;" and that statement was true. Witness would not say that defend-

ant did or did not aim his gun from Evans's gallery post at the hack behind which deceased was standing. He would not swear positively that the deceased left the cover of the hack with his pistol, before the defendant pointed the gun at him. He did say in his examination in chief that the deceased started around the hack with his pistol before defendant Miller raised his gun. Witness was not, however, certain about it, and would not now so swear. While behind the hack, and before his exchange of shots with the Hardins, Linson made no assault on any one that witness saw.

Reese Nichols testified, for the defense, that he was, on May 25, 1882, in the employ of the Hardins. He was in Jewett on that day, having assisted in bringing in some cattle the Hardins had sold. A. B. Hardin, jr., Dock Dubois, Mr. McLin, and witness drove the cattle a short distance to graze, early on the morning of May 25, and left them on the range at twelve o'clock, to go to the house of A. B. Hardin, jr., in Jewett, to dinner. Witness went down town after dinner, leaving A. B. Hardin and McLin at the house. When the witness got to town, a fight between deceased and defendant was in progress in front of Evans's drug store. He did not see A. B. Hardin, jr., on the ground during the difficulty. The latter's house was one hundred and fifty yards distant from where the fight was going on. Dock Dubois testified to the same effect.

Doctor W. F. Evans testified, for the defense, that he examined the wound received by A. B. Hardin, jr., in the fight. He was shot through the arm near the shoulder, the ball entering the rear or back part of the arm and coming out in front.

J. J. Dotson testified, for the defense, that when the difficulty occurred he lived two blocks west and in the rear of the main business street in Jewett. Just after he started from his dinner to his office, which was then up stairs over Hardin's saloon, he heard shooting on the street. He walked on to the rear of Platt and Reid's store, which adjoined Hardin's saloon, entered the back door of that store, passed on through and out to the gallery in front. He then saw a man, whom he did not at first recognize, standing behind a hack, out in the street. The man appeared to be loading a pistol. The witness then went up stairs and out to the gallery in front of his office. He then saw a man leading a horse towards the man behind the hack, and he saw Swan Hardin, at the same time, walking in the same direction. When the man with the horse, Mr. Oden, reached the man be-

hind the hack, the latter sprang on his horse and leveled his pistol at Swan Hardin. Swan Hardin threw his hand to his side. The witness then turned into his office. He heard the firing that ensued, but saw nothing more than related. Swan Hardin did not have a pistol in his hand when he walked towards the man at the hack.

In rebuttal, C. M. Black testified, for the State, that he heard Swan Hardin tell his father, in his saloon, on the evening before the difficulty, that Bob Linson, the deceased, had that evening talked to A. B. Hardin, jr., in a very rough manner. This evidence was presented to rebut the defendant's evidence of good feeling between the Hardins and the deceased.

It was admitted that the defendant had no weapons visible when he first approached the deceased; that he attempted to use none in the first affray, and that the proof failed to show that he shot at the deceased at all.

The motion for new trial, which was overruled, assailed the charge of the court, the action of the court in refusing charges asked, and denounced the verdict as unsupported by the evidence.

*Wood, Johnston & Dotson*, for the appellant.

*J. H. Burts*, Assistant Attorney General, and *N. G. Kittrell*, for the State.

Willson, Judge. This conviction is for manslaughter, and the punishment assessed is two years confinement in the penitentiary. The indictment charges the murder of one Robert Linson.

That our decision of the questions presented in the record may be properly understood, it is necessary that we should summarize the facts in evidence:

Robert Linson was shot and killed in the town of Jewett, Leon county, on the twenty-fifth of March, 1882. Linson, who was a small man, was attacked by the defendant, who was a large man, without provocation and in a violent manner. An effort was made to separate them, when Swan Hardin prevented their separation. Defendant got Linson down on the ground, and beat him severely, and kicked and spurred him on the head, until he was pulled away. After Linson got loose from defendant, and when defendant was again advancing upon him, he,

Linson, drew a pistol and shot at defendant, and then shot also at one Harris, who had interfered in the difficulty in behalf of defendant.   Several shots were exchanged between Linson and Harris, and Harris was wounded and retired from the conflict. Linson then got behind a hack, a short distance off, and reloaded his pistol.   In the meantime defendant had gone after a gun, and returned with a Winchester rifle, with which he attempted to shoot Linson, but was prevented from shooting.   At this junc- ture the county attorney appeared upon the scene, and called upon those who were present, among whom were A. B. Hardin, senior, A. B. Hardin, junior, and Swan Hardin, to arrest the parties who had been engaged in the shooting.   Swan Hardin thereupon approached Linson, and was followed by his brother, A. B. Hardin.   Linson's horse had been led to him, and, when Swan Hardin had reached within a few steps of Linson, some words passed between them, when Linson leaped upon his horse, pistol in hand, and fired upon Swan Hardin.   Swan Hardin fired upon Linson at the same instant.   As Linson rode off he fired again at Swan Hardin and Swan Hardin fired two other shots at him.   Swan Hardin was wounded by one of Linson's shots.   As Linson rode off he was also fired upon by A. B. Har- din, sr., and A. B. Hardin, jr., and after going a few steps he fell from his horse, dead.   While the shooting between the Har- dins and Linson was taking place, the defendant was a little distance away, with his gun, but did not shoot or make any attempt at that time to shoot, and was apparently taking no part in the difficulty.   From the commencement of the difficulty between Linson and the defendant to the killing of Linson was but a very short time, perhaps not exceeding ten minutes.

Now, upon this state of facts what is the law?   We will state our view of it as applicable to the case:

1.   If the defendant was acting together with the Hardins, or either of them, in provoking a contest with Linson, with the pur- pose and intent of killing said Linson, or doing him serious in- jury, and in pursuance of this common design and purpose the Hardins, or either of them, the defendant being present, shot and killed Linson, then the defendant would be guilty as a prin- cipal in the murder, as much so as if he had fired the fatal shot.

2.   If the Hardins were justifiable in killing Linson, the de- fendant would not be guilty of the homicide.   Thus, if Swan Hardin, in good faith, without the purpose or intent to kill Lin- son or do him serious injury, advanced upon Linson for the pur-

pose of arresting him for a felony or breach of the peace committed within his view, and Linson fired upon him, and Swan Hardin, or his father or brother, or all of them together, fired upon and killed Linson in the necessary defense of the life of Swan Hardin, then this would be justifiable homicide, and neither the Hardins nor the defendant would be guilty of unlawful killing.

3. If the difficulty between Linson and defendant had terminated, and the Hardins, without the knowledge, advice, concurrence, aid and encouragement of the defendant, independently, of their own accord, and to accomplish a purpose and intent of their own, shot and killed Linson, the defendant would not be responsible for their acts, although he was himself seeking to kill the deceased unlawfully.

4. If the defendant attempted to shoot the deceased, with intent to kill him, and in such attempt was actuated by malice aforethought, and under circumstances in which, if the death of Linson had resulted, the homicide would have been murder, and the defendant was prevented from any cause from effecting his purpose, than he would be guilty of assault with intent to murder.

5. There is no evidence in the case which would warrant a charge or sustain a conviction for manslaughter, viewing and construing the facts fairly and reasonably.

A voluminous charge was given to the jury by the learned trial judge, which covers thirty-eight pages of the transcript. It contains instructions upon several issues which are in no manner presented by the evidence in the case, and which could only tend to confuse and mislead the jury. We shall not pause to point out these objectionable instructions in detail. It was doubtless the object of the learned judge to give to the jury *all* the law applicable to the evidence in the case; but, in his anxiety to do this, we think he submitted several issues not raised by the facts in proof. On the other hand, he failed to instruct the jury fully and correctly upon the two propositions stated in paragraphs 2 and 3 of this opinion; which in our judgment are vital issues in the case, and are fairly presented by the evidence. Special charges upon these issues were requested by the defendant and refused by the court, and the action of the court in refusing them was properly excepted to.

Numerous and specific exceptions were made to the charge of the court as given to the jury, and are presented for our con-

sideration in a bill of exceptions. It would consume too much time, and lengthen this opinion unnecessarily, were we to enter upon a discussion of the various objections made to the charge of the court; many of which we think are tenable. We have said enough, we think, to make plain our view of the law as applicable to the facts of this case, and as the charge given to the jury does not in our opinion, properly present the law, but in some respects erroneously presents it, and presents issues not raised by the evidence, and in such manner as to prejudice perhaps the defendant's rights, the judgment is reversed and the cause is remanded for a new trial.

*Reversed and remanded.*

Opinion delivered November 24, 1883.